# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 23-20191

HILDA M. CASTANEDO ESCALON; ESTATE OF HILDA CASTANEDO;
ESTATE OF EMMA DIAZ,

*Plaintiffs-Appellants,*

– v. –

TRAFIGURA TRADING L.L.C.; TRAFIGURA GROUP PTE LIMITED;
TRAFIGURA PTE LIMITED,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS (HOUSTON), CASE NO. 4:21-CV-659
HONORABLE ALFRED H. BENNETT, U.S. DISTRICT JUDGE

## BRIEF FOR PLAINTIFFS-APPELLANTS HILDA M. CASTANEDO ESCALON, AS THE PERSONAL REPRESENTATIVE OF THE ESTATE OF HILDA CASTANEDO AND THE ESTATE OF EMMA DIAZ

JARED R. BUTCHER
DAVID A. BARON
MELVIN WHITE
BERLINER CORCORAN & ROWE LLP
*Attorneys for Plaintiffs-Appellants*
1101 17th Street, NW, Suite 1100
Washington, DC 20036
(202) 293-5555
jbutcher@bcrlaw.com
dbaron@bcrlaw.com
mwhite@bcrlaw.com

## Certificate of Interested Persons

Appellants Hilda M. Castanedo Escalon, *et al.*, by their undersigned counsel and under Fed. R. App. P. 26.1 and 5th Cir. R. 26.1-1, certify that this Certificate of Interested Persons constitutes a complete list of the persons, firms, partnerships, corporations, and entities who have interest in the outcome of this appeal. Identifiable interested parties to the action are:

- Plaintiff Hilda M. Castanedo Escalon
- Plaintiff Estate of Hilda Castanedo
- Plaintiff Estate of Emma Diaz
- Defendant Trafigura Trading, LLC
- Defendant Trafigura Pte Ltd.
- Defendant Trafigura Group Pte Ltd.
- Other members of the Trafigura Group may have a financial interest in the outcome of this litigation.
- Baron, David A., Attorney for Appellants
- Berliner Corcoran & Rowe, LLP Attorneys for Appellants
- Bennett, Alfred H, U.S. District Court Judge, Southern District of Texas
- Brackett, Alex J., Attorney for Appellees
- Butcher, Jared, R., Attorney for Appellants
- Cunniff, Martin, Attorney for Appellants
- Eppler, Dale, Attorney for Appellants
- Fields PLLC, Attorneys for Appellants

- Fields, Richard W., Attorney for Appellants

- Lopez, Laina C., Attorney for Appellants

- Madriz, Yasser A., Attorney for Appellees

- MCGUIREWOODS LLP, Attorneys for Appellees

- White, Melvin, Attorney for Appellants

Appellants are not corporations, and thus, they have no parent corporations, nor does any publicly traded corporation own 10% or more of their stock.

BERLINER CORCORAN & ROWE LLP

/s/ Jared R. Butcher
Jared R. Butcher
jbutcher@bcrlaw.com
David A. Baron
dbaron@bcrlaw.com
Melvin White
mwhite@bcrlaw.com
1101 17th Street, N.W., Suite 1100
Washington, D.C. 20036-4798
Tel:  (202) 293-5555
Facsimile:  (202) 293-9035

Counsel for Plaintiffs-Appellants

**Statement Regarding Oral Argument**

Oral argument is necessary and will assist the Court in resolving this appeal, which raises important questions of first impression regarding Florida probate law and its interaction with the private right of action Congress created under the Helms-Burton Act for victims of the Castro regime.

# Table of Contents

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ...................................................... iii

Table of Contents ................................................................................... iv

Table of Authorities .............................................................................. vi

Introduction .............................................................................................1

Statement of Jurisdiction.........................................................................5

Issues Presented .......................................................................................5

Statement of the Case..............................................................................6

    A.   Cuba Confiscated The Family Mining Business In 1960 ............................6

    B.   The HBA Entered Into Force In 1996 But The Private Right Of
          Action For Victims Of The Castro Regime Was Suspended Until
          2019 .................................................................................................8

    C.   Trafigura Continues To Traffic In The Confiscated Mining Business
          And Its Assets In Cuba.....................................................................10

    D.   The Personal Representative, Acting On Behalf Of The Estates,
          Sued Trafigura For Trafficking.......................................................11

Summary of the Argument.....................................................................13

Standard of Review.................................................................................15

Argument.................................................................................................16

    A.   The Personal Representative Was, And Is, Authorized To Pursue
          Emma's And Hilda's Claims .............................................................16

    B.   The District Court Erred By Dismissing Emma's And Hilda's
          Claims Based On A Misconstruction Of Florida Probate Law .................19

      1.   Under Florida probate law, the Estates did not "acquire ownership"
           of the claims from Emma and Hilda .......................................19

      2.   Under Florida probate law, the Personal Representative stepped
           into Emma's and Hilda's shoes to bring the claims those decedents
           owned at death .........................................................................22

3.    The District Court relied on *Seaboard Marine's* misconstruction of Florida probate law ...................................................................................25

C.    Barring Claims Brought As Part Of The Administration Of Estates Would Undercut Title III's Purpose And Raise Serious Separation-Of-Powers Concerns ...................................................................................27

Conclusion ...........................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ABC Arbitrage Plaintiffs Group v. Tchuruk*,
    291 F.3d 336 (5th Cir. 2002) ................................................................15

*All Children's Hosp., Inc. v. Owens*,
    754 So. 2d 802 (Fla. Dist. Ct. App. 2000)............................................23

*Barnhill v. Johnson*,
    503 U.S. 393 (1992) ..............................................................................20

*Cimarex Energy Co. v. CP Well Testing, L.L.C.*,
    26 F.4th 683 (5th Cir. 2022) ................................................................16

*Depriest v. Greeson*,
    213 So. 3d 1022 (Fla. Dist. Ct. App. 2017)........................................26

*Est. of Tallman ex rel. Tallman v. City of Gastonia*,
    682 S.E.2d 428 (N.C. App. 2009) .......................................................21

*Fernandez v. Seaboard Marine, Ltd.*,
    No. 20-CV-25176, 2021 WL 4902506 (S.D. Fla. Oct. 21, 2021) ............... *passim*

*Garcia-Bengochea v. Carnival Corp.*,
    57 F.4th 916 (11th Cir. 2023) ..........................................................9, 19

*Glen v. Am. Airlines, Inc.*,
    7 F.4th 331 (5th Cir. 2021) .............................................................19, 20

*Levy v. Baptist Hosp. of Miami, Inc*.,
    210 So. 2d 730 (Fla. 3d DCA 1968).................................................15, 25

*Magwood v. Tate*,
    835 So. 2d 1241 (Fla. Dist. Ct. App. 2003)........................................23

*Markham v. Allen*,
    326 U.S. 490 (1946) ..............................................................................17

*Matter of Tr. Est. of Renjes*,
    42 Haw. 151 (1957) ..............................................................................21

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ...........................................................15, 16

*Republic Bankers Life Ins. Co. v. Bunnell*,
 478 S.W.2d 800 (Tex. Civ. App. 1972) ................................................21

*Rice v. Green*,
 941 So. 2d 1230 (Fla. Dist. Ct. App. 2006).........................................18

*Sharps v. Sharps*,
 214 So. 2d 492 (Fla. Dist. Ct. App. 1968)...........................................25

*Smith v. Cimmet*,
 199 Cal. App. 4th 1381 (2011)..............................................................21

*Spradley v. Spradley*,
 213 So. 3d 1042 (Fla. 2d DCA 2017)....................................................22

*State v. Lahurd*,
 632 So. 2d 1101 (Fla. Dist. Ct. App. 1994).................................. 14, 23

*Sullivan v. Sessions*,
 80 So. 2d 706 (Fla. 1955) ........................................................... 14, 23

*Trent v. Nat'l City Bank of Indiana*,
 145 F. App'x 896 (5th Cir. 2005)..........................................................17

*United States v. Est. of Schoenfeld*,
 344 F. Supp. 3d 1354 (M.D. Fla. 2018) ...............................................22

*Wilkes v. United States*,
 No. 3:97-CV-1317-J-21A, 2000 WL 1367885 (M.D. Fla. Oct. 18, 2000) .........21

*Zaboth v. Beall*,
 26 Va. Cir. 269, 1992 WL 884464 (Va. 1992)......................................21

## Statutes and Other Authorities:

22 U.S.C. § 6021 .............................................................................1, 17

22 U.S.C. § 6023(13)(A)..........................................................................2

22 U.S.C. § 6023(13)(A)(ii)...................................................................10

22 U.S.C. § 6023(13)(A)(iii)..................................................................10

22 U.S.C. § 6064(a) ................................................................................27

22 U.S.C. § 6081(1) ..................................................................................8

22 U.S.C. § 6081(2) ..................................................................................8

22 U.S.C. § 6081(3) ..................................................................................8

22 U.S.C. § 6081(6) ..................................................................................8

22 U.S.C. § 6081(8) ..............................................................................8, 27

22 U.S.C. § 6081(11) ............................................................................9, 27

22 U.S.C. § 6082 ......................................................................................9

22 U.S.C. § 6082(a)(1) ...........................................................................2, 9

22 U.S.C. § 6082(a)(1)(A) .........................................................................2

22 U.S.C. § 6082(a)(4) ............................................................................12

22 U.S.C. § 6082(a)(4)(B) .......................................................................19

22 U.S.C. § 6085(c)(1)(B) .......................................................................27

22 U.S.C. § 6085(h)(1)(B) .......................................................................27

28 U.S.C. § 1291 .......................................................................................5

28 U.S.C. § 1331 .......................................................................................5

Fla. Stat. § 731.201(14) .......................................................... 14, 21, 22, 26

Fla. Stat. § 731.201(32) .................................................................. 15, 21, 25

Fla. Stat. § 733.607(1) ............................................................................23

Fla. Stat. § 733.612 ................................................................................24

Fla. Stat. § 733.612(20) ........................................................... 14, 17, 22, 24

Fla. Stat. § 733.612(24) ...........................................................................23

Fed. R. Civ. P. 12(b)(6) ...........................................................................15

H.R. Rep. No. 104-202 (1995) ............................................................ 15, 27

33 C.J.S. Executors and Administrators § 5 .............................................22

*Black's Law Dictionary*, Bryan A. Garner (6th ed., 1990) .....................20

*Oxford English Dictionary*, Oxford University Press (2nd ed., 1989) ....20

*Webster's New World College Dictionary*, Houghton Mifflin Harcourt
(4th ed., 2004)........................................................................................................20

**Introduction**

In 1968, Plaintiff-Appellant Hilda Castanedo Escalon ("Escalon" or "Personal Representative") was forced to flee her home country of Cuba as a teenager, never to return. She spent five long years living alone in the United States, before her mother Hilda Castanedo ("Hilda") and her aunt Emma Diaz ("Emma") joined her in Miami (she never saw her father again). The family's lucrative mining business and other property remained in Cuba, where it had been confiscated by the Castro regime in 1960 with no compensation paid to the family. Her grandfather Waldo, a second-generation owner of the family's mining business, was so devastated that he suffered a massive stroke and remained paralyzed until his death in Cuba a few years later. The Castro regime's oppression forced other family members to flee Cuba too.

Over the ensuing three decades, Escalon rebuilt her life in the U.S. with her mother and aunt. They became U.S. citizens and created a new family in their new country. Then, in 1996, Congress acted to provide compensation to victims of the Castro regime. The Cuban Liberty and Democratic Solidarity Act (LIBERTAD) of 1996, 22 U.S.C. § 6021, *et seq.*—also known as the Helms-Burton Act ("HBA")—seeks to deter the unauthorized commercial exploitation of confiscated property in Cuba, and Title III of the HBA provides for a private right of action against "any person that … traffics in property which was confiscated by the Cuban Government"

1

without authorization from the U.S. national who owns the claim to such property. 22 U.S.C. § 6082(a)(1)(A).

Emma and Hilda, as claimants to the confiscated mining business, could have brought claims under Title III, but once again, compensation was denied to them because private rights of action were suspended under the authority given to the President under Title III. Emma passed away in July 1996, a few months after the enactment of the HBA. Hilda followed in June 2000.

Two more decades passed, but then, in 2019, the State Department announced a full lifting of the suspension of bringing private rights of action, effective May 2, 2019. This opened federal courts to victims of Castro's confiscations, giving them the opportunity for the first time to seek damages against anyone who "traffics" in their stolen property. 22 U.S.C. § 6082(a)(1). That includes anyone who "engages in a commercial activity using or otherwise benefiting from confiscated property," and anyone who "directs," "participates in," or "profits from" another person's trafficking. *Id.* § 6023(13)(A).

The Singapore-based Trafigura Group does both. That Group—which includes the Defendants-Appellants[1]—operates a global commodities trading business that includes a mining operation in Cuba, conducted through a joint venture

---

[1] The Trafigura Group includes Trafigura Group Pte Ltd. and its subsidiaries Trafigura Pte Ltd. and Trafigura Trading, LLC. *See* ROA.134 (chart of the Trafigura Group's corporate structure); ROA.291 (listing the principal entities of the Group).

with the Cuban government called EMINCAR. That mining operation uses and benefits from the confiscated family business, its former mines and other property, and other assets taken from Emma, Hilda, and the rest of their family. Defendants-Appellants Trafigura Group Pte Ltd., Trafigura Pte Ltd., and Trafigura Trading, LLC (collectively "Trafigura") are members of the Trafigura Group and are involved in the Cuban mining operation in various ways, both directly and through their relationships with affiliates and Cuban government agencies. This is trafficking.

Escalon set about building a case against Trafigura through the same hard work and determination with which she built her new life here. She gathered evidence, retained counsel, engaged in settlement discussions with Trafigura, and, in 2020, was appointed as the Personal Representative of the Estate of Emma Diaz and the Estate of Hilda Castanedo (the "Estates"). Although Trafigura was well aware of the U.S. laws pertaining to doing business in Cuba, they refused every opportunity to resolve this dispute by paying the compensation due to the rightful owners of the Cuban mining operation that now feeds valuable commodities into the Trafigura Group's multi-billion-dollar global trading empire. So Escalon, in her capacity as the Personal Representative, sued Trafigura.

The district court dismissed that suit in a thinly reasoned order invoking a provision of the HBA that bars actions based on claims to confiscated property that were "acquired" after March 1996. The district court found that Emma's and Hilda's

claims were "acquired" by either the Personal Representative, who was their only heir listed in their wills, or by the Estates themselves. Either way, the court held, the acquisition was untimely because it purportedly occurred when Emma and Hilda passed away after the HBA's March 12, 1996 bar date.

That holding misunderstands the HBA and Florida probate law. Under Florida law, neither the Estates nor the Personal Representative engaged in an untimely acquisition of Emma's and Hilda's claims. The Estates were not capable of acquiring the claims because, under Florida law, an estate is defined as the property of the decedent; it is not a legal entity capable of acquiring property. Nor did the Personal Representative acquire the claims. Rather, she was properly appointed to stand in Emma's and Hilda's shoes and bring their claims as part of the administration of their Estates. Because the HBA's bar date would not have applied to Hilda and Emma, it also did not, and does not, apply to the Personal Representative acting on behalf of their Estates.

The district court's erroneous holding leads to the absurd outcome of penalizing certain claim holders for dying at the wrong time—*i.e.*, when the private right of action was in effect but suspended (March 12, 1996 to May 2, 2019). The HBA's remedial purpose is thwarted by creating a safe harbor for traffickers and depriving Castro's victims and their families of the compensation that Congress intended to provide them. This Court should reverse.

4

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. § 1331. The district court granted Defendants-Appellees' motion to dismiss on March 15, 2022 (ROA.2852-2858) and denied reconsideration on March 29, 2023. ROA.2919. This appeal followed on April 26, 2023. ROA.2920-2921. This Court has jurisdiction under 28 U.S.C. § 1291.

## Issues Presented

1.      A Florida state probate court entered two orders appointing Appellant Hilda Castanedo Escalon as the personal representative of the estates of her mother and aunt and authorizing her to administer those estates, which included her mother's and aunt's claims under Title III of the HBA. Did the district court err by disregarding those orders and holding instead that those claims were not part of the estates?

2.      Under Florida law, an estate is defined as the property of a decedent that is the subject of administration. An estate is not a legal entity capable of acting in its own right. Did the district court err by holding, alternatively, that the mother's and aunt's estates "acquired ownership" of their claims after the HBA's bar date of March 12, 1996?

3.      The HBA bars actions based on claims to confiscated property if ownership of those claims was "acquired" after the HBA's March 12, 1996 effective

date. Ms. Escalon's mother and aunt acquired ownership of their claims before 1996 but died after the HBA's effective date. Did the district court's opinion contravene Florida probate law by denying the ability of the personal representative to step into the shoes of the deceased mother and aunt and bring their claims as authorized by the Florida probate statutes and the Florida probate court's orders?

## Statement of the Case

### A.     Cuba Confiscated The Family Mining Business In 1960

Beginning in 1913, Escalon's family built a mining business in the Pinar del Rio province in Cuba and extended their business into a vast territory known today as the Matahambre-Castellanos-Santa Lucia Mining District. ROA.9 ¶2, ROA.15 ¶25. Over the ensuing forty-seven years, the business expanded to include a mining operation through the family-owned company Minas de Matahambre, S.A. (the "Company"), the assets of the Company, including valuable mineral exploration and exploitation rights as well as access rights and other interests in a private port used to export commodities, and a sulfuric acid plant known as Rometales. ROA.14-17 ¶¶24, 26-30. By 1960, the Company operated the largest mine in Cuba and was one of the most prominent companies in the Cuban economy. ROA.19 ¶36.

On July 21, 1960, the Castro regime announced the confiscation of the Company, its assets, and Rometales, which were confiscated by June 1961. ROA.18-19 ¶35.  The Cuban government confiscated (i) the mining operation run by the

Company, (ii) the Company's assets, including Terminal Maritima de Santa Lucia (the "Terminal"), the port terminal of Santa Lucia and its facilities (the "Port"), agricultural land, mining concessions, roads, infrastructure, intangibles, and future and contingent rights, and (iii) Rometales, which operated the sulfuric acid plant next to the Port (collectively, the "Confiscated Property"). ROA.9 ¶2, ROA.14-15 ¶24. Escalon's family received no compensation, but the Cuban government continued to enjoy substantial profits from the confiscated mining business over the next four decades. ROA.19 ¶37.

The wrongful confiscation ruined the family. Waldo P. Diaz, Escalon's grandfather and an owner of the Company, died in Cuba two years later in 1962. ROA.16 ¶28. Hilda and Emma eventually fled Cuba, joined Escalon in the U.S., and became U.S. citizens; having left everything behind in Cuba, they spent the rest of their lives rebuilding their family here. *Id.* Emma passed away on July 27, 1996, and Hilda passed away on June 6, 2000. *See* ROA.31-43, ROA.44-56 (probate court filings). They acquired ownership of their claims to the Confiscated Property when their father Waldo died, well before 1996. ROA.25-26 ¶60, *see also* ROA.67-69 (Escalon affidavit describing family history).

**B.    The HBA Entered Into Force In 1996 But The Private Right Of Action For Victims Of The Castro Regime Was Suspended Until 2019**

The HBA was enacted in 1996 to preserve the "fundamental right to own and enjoy property which is enshrined in the United States Constitution" and to provide a remedy for the "wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner." 22 U.S.C. § 6081(1),(2). Congress found that "[s]ince Fidel Castro seized power in Cuba in 1959 … he has trampled on the fundamental rights of the Cuban people; and … through his personal despotism, he has confiscated the property of" Cuban citizens, U.S. nationals, and Cubans who have sought asylum in the United States. 22 U.S.C. § 6081(3).

The Cuban Government has allowed foreign companies, such as the Trafigura Group, to benefit and profit from using confiscated property. "This 'trafficking' in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise, to the current Cuban Government and thus undermines the foreign policy of the United States." 22 U.S.C. § 6081(6).

Because international law "lacks fully effective remedies" for this exploitation of confiscated property, 22 U.S.C. § 6081(8), Congress decided that "the victims of these confiscations should be endowed with a judicial remedy in the courts of the

United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11). Title III of the HBA provides that remedy by authorizing a private right of action for damages against such traffickers. *See* 22 U.S.C. § 6082. Although Title III's creation of liability as to those engaged in trafficking has remained in force since August 1996, the ability of any potential plaintiff to bring a private right of action for Title III violations had been suspended by the President until May 2019, when President Donald Trump allowed the suspension of Title III's private right of action to lapse, thereby allowing such actions to proceed. *See Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 920 (11th Cir. 2023).

The private right of action created by Title III imposes liability on persons who "traffic" in property confiscated by the Cuban Government on or after January 1, 1959, the claims to which are owned by persons who are U.S. nationals. Specifically, the Act provides:

> (1) Liability for trafficking. — (A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages.... 22 U.S.C. § 6082(a)(1).

Trafficking is defined broadly to include, among other things, "engag[ing] in a commercial activity using or otherwise benefitting from confiscated property" and "(iii) caus[ing], direct[ing], participat[ing] in, or profit[ing] from, trafficking … by

another person, or otherwise engag[ing] in trafficking … through another person...."

22 U.S.C. § 6023(13)(A)(ii), (iii).

### C.    Trafigura Continues To Traffic In The Confiscated Mining Business And Its Assets In Cuba

In direct contravention of U.S. foreign policy, Trafigura trafficked, and continues to traffic, in the Confiscated Property. In 2015, the Trafigura Group—which includes Trafigura—made a substantial investment in a mining operation in Cuba, conducted through an entity called EMINCAR, a joint venture between Trafigura and the Cuban state agency Geominera (ROA.28 ¶75), and it continues to operate today. *See* ROA.420 (2020 Annual report describing "[t]he Castellanos lead and zinc mine, a joint venture between Trafigura and Cuban parastatal Geominera.").[2] Trafigura owns a 49 percent interest in the joint venture, which it funded with an initial investment of $230 million, increasing to $297.5 million in 2018. ROA.22 ¶¶ 50-51. The mining operation achieved profitability in 2018 and is expected to continue for at least twenty-two years. *Id.* ¶51.

Trafigura's global trading business uses, benefits from, and profits from their Cuban mining operations, which occupy and use the Confiscated Property. ROA.24 ¶ 55. The success of Trafigura's trading activities in the U.S. and globally depends

---

[2] The Cuban mining operations continue to be featured on Trafigura's website at https://www.trafigura.com/about-us/assets-and-alliances/trafigura-mining-group/ (last visited July 5, 2023).

on the ability to take advantage of arbitrage opportunities in the Trafigura Group's markets. *See* ROA.204-205 (Sept. 11, 2020 prospectus for notes guaranteed by Trafigura describing arbitrage opportunities). These opportunities arise because of Trafigura's mining and related activities using the Confiscated Property.

In contravention of the HBA, Trafigura has never obtained authorization from, or paid any compensation to, Plaintiffs-Appellants for the use of the Confiscated Property. ROA.26 ¶61.

### D. The Personal Representative, Acting On Behalf Of The Estates, Sued Trafigura For Trafficking

Escalon, in her capacity as the Personal Representative of the Estates, sued Trafigura on March 1, 2021, alleging Emma's and Hilda's claims for trafficking in the Confiscated Property. ROA.8-30. The district court found that standing exists under Article III but that the claims are barred because Emma and Hilda passed away after March 12, 1996. ROA.2858. The district court reached none of the other arguments raised by either side.

The district court gave two primary reasons for dismissal. First, the court cited Emma's and Hilda's wills, finding that "any rights Decedents had to the Confiscated Property vested in Escalon on the dates of their deaths: July 27, 1996 and June 6, 2000, respectively." ROA.2857. But this finding is contrary to the orders of the Florida probate court admitting those wills to probate, both of which authorize the Personal Representative to pursue the Title III claims as assets that are part of the

Estates. This would not have been possible if the claims had immediately vested in Emma's and Hilda's heir (Escalon) and were no longer part of their Estates; *i.e.*, their property subject to administration.

The district court also relied on an out-of-circuit decision in *Fernandez v. Seaboard Marine, Ltd.*, No. 20-CV-25176, 2021 WL 4902506 (S.D. Fla. Oct. 21, 2021). ROA.2857. That decision was issued months after the parties completed their briefing on the motions to dismiss and was not addressed by either side. Among other problems, the *Seaboard Marine* decision incorrectly construes Florida probate law to require dismissal of claims because the original claim owners passed away after March 12, 1996, the HBA's bar date for Title III claims. *See* 22 U.S.C. § 6082(a)(4). Thus, it wrongly penalizes claim owners simply because they passed away between March 12, 1996 (the bar date) and May 2, 2019 (the date when private actions were permitted by the Executive Branch).

Plaintiffs-Appellants moved for reconsideration of the dismissal order on April 13, 2022. ROA.2864-2873. Trafigura opposed, and briefing was completed on May 11, 2022. ROA.2874-2888, ROA.2913-2917. Over ten months later, the district court issued a brief order denying reconsideration, relying on its prior analysis, and providing no additional substantive analysis of the issues. ROA.2919.

## Summary of the Argument

The district court's thinly reasoned dismissal order misapprehends and misapplies Florida state probate law. There is no dispute that Emma and Hilda acquired ownership of their claims before the HBA's bar date of March 12, 1996. This satisfies the HBA's timeliness requirement because the owners of the claims at issue—Emma and Hilda—timely acquired those claims.

It is also undisputed that the Florida state probate court, applying the Florida probate code, appointed Escalon as the Personal Representative and authorized her to prosecute Emma's and Hilda's claims as part of their Estates. The district court should have followed the Florida probate court's orders and found that Emma's and Hilda's claims were part of their Estates and could be prosecuted by the Personal Representative. Instead, the district court incorrectly found those claims vested in Emma's and Hilda's heir (Escalon) immediately when they died, leaving no claims in the Estates. The district court ignored the plain language of the probate court orders to the contrary. This was error.

The district court's error finds no support in the HBA. That statute says nothing about estates, nor does it purport to displace state probate laws or cabin the power of a personal representative appointed by a state probate court. Emma and Hilda resided in Florida at the time of their deaths, and their Estates are subject to administration in the Florida state probate court in Miami-Dade County, which

authorized the Personal Representative to pursue their claims on behalf of their Estates. The district court effectively overruled that authorization based on its own (incorrect) interpretation of Florida probate law.

The district court attempted to buttress its error with an alternative finding that, even if Emma's and Hilda's claims did not vest in their heir (Escalon), and thus remained part of their Estates, those claims still must be dismissed because the Estates "acquired ownership" of the claims from Emma and Hilda after the HBA's bar date. But this too was error.

First, the district court misunderstood the legal nature of the Estates. Florida's probate code defines an estate as simply "the property of a decedent that is the subject of administration." Fla. Stat. § 731.201(14). If the estate is the property of the decedent, it cannot acquire that property. Property cannot acquire itself.

Second, the district court misunderstood the posture and authority of the Personal Representative. A personal representative is authorized to prosecute claims that are part of the estate, to satisfy and settle claims, and to distribute the proceeds. Fla. Stat. § 733.612(20). But the claims and other "estate assets are not the personal representative's property." *State v. Lahurd*, 632 So. 2d 1101, 1103 (Fla. Dist. Ct. App. 1994). Rather, the personal representative merely "'stands in [the decedent's] shoes.'" *Sullivan v. Sessions*, 80 So. 2d 706, 707 (Fla. 1955). The personal representative may bring "causes of action the decedent had at the time of death."

14

Fla. Stat. § 731.201(32), and those causes of action are "subject to the strength and weakness of the decedent's cause of action had [they] survived." *Levy v. Baptist Hosp. of Miami, Inc*., 210 So. 2d 730, 731 (Fla. 3d DCA 1968). Had Emma and Hilda survived, the HBA's bar date would not have applied, so it was error to apply it to the Personal Representative acting on behalf of their Estates.

Finally, the district court's overbroad application of the HBA's bar date expands its effect far beyond the narrow concern it addressed, which was to "eliminate any incentive that might otherwise exist" for foreigners "to transfer claims to confiscated property to U.S. nationals in order to take advantage of the remedy created by" the HBA. H.R. Rep. No. 104-202, at 40 (1995). Preventing the duly appointed personal representative of a deceased claim holder from pursuing a valid trafficking claim undermines the statute's purposes and raises serious separation-of-powers concerns.

## Standard of Review

The Court reviews *de novo* the district court's decision to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001). A Rule 12(b)(6) motion should be granted only if it appears beyond a reasonable doubt that a plaintiff can prove no set of facts supporting her claim that would entitle her to relief. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 348 (5th Cir. 2002). Like the district court, the Court

15

accepts as true the allegations in the complaint and construes them in the light most favorable to the plaintiff. *Nathenson*, 267 F.3d at 406.

The Court reviews questions of statutory interpretation *de novo*. *Cimarex Energy Co. v. CP Well Testing, L.L.C.*, 26 F.4th 683, 687 (5th Cir. 2022).

## Argument

### A.   The Personal Representative Was, And Is, Authorized To Pursue Emma's And Hilda's Claims

The district court erred by finding that ownership of Emma's and Hilda's claims immediately vested in their heir (Escalon) when they passed away in July 1996 and June 2000 respectively. The district court incorrectly reasoned that, because Escalon was also the beneficiary of their wills, she inherited the claims at their deaths and could not later bring those claims as the Personal Representative acting on behalf of the Estates. ROA.2857. The district court's finding is directly contradicted by the Florida probate court's orders authorizing the Personal Representative to pursue Emma's and Hilda's claims as part of administering their Estates. Those orders were provided to the district court, their validity was not challenged, and they are dispositive.

On July 8, 2020, the Personal Representative filed petitions for administration of the Estates in the Probate Division of the Circuit Court for Miami-Dade County. ROA.34-35 (Emma), ROA.47-48 (Hilda).  The only asset listed for each Estate was:

16

> Right to pursue a cause of action pursuant to the Cuban Liberty and
> Democratic Solidarity (LIBERTAD) Act, 22 U.S.C. Section 6021, et
> seq. (the "Act") on property and rights confiscated (the "Confiscated
> Property") to decedent … and to her father Waldo Pascual Diaz y
> Martinez by the Cuban Government without authorization by or
> compensation paid to their rightful owners ….

*Id.* The Florida probate court entered orders admitting both wills to probate and appointing Escalon as the Personal Representative for both Estates. ROA.42-43, 55-56. This means that the Personal Representative was, and is, authorized to pursue those claims on behalf of the Estates. *See* Fla. Stat. § 733.612(20) (personal representative may "[p]rosecute or defend claims or proceedings in any jurisdiction for the protection of the estate, of the decedent's property ….").

The district court inexplicably overruled the Florida probate court's orders. The latter authorize the Personal Representative to pursue Emma's and Hilda's claims as part of their Estates, while the former concludes that the claims are not part of their Estates. Where, as here, a state court has ruled on an issue of state probate law, that ruling is entitled to deference. *See Trent v. Nat'l City Bank of Indiana*, 145 F. App'x 896, 898 (5th Cir. 2005) (stating that "the federal court 'has no jurisdiction to probate a will or administer an estate.'" (quoting *Markham v. Allen*, 326 U.S. 490, 494 (1946))). Deference to the Florida probate court is also appropriate because Trafigura did not challenge the propriety of the Florida probate court's orders when arguing for dismissal of the claims. *See* ROA.140 and ROA.809 (Trafigura's briefs arguing that claims vested in Escalon). The only assets listed as part of the Estates

17

were the claims to the Confiscated Property, making it abundantly clear to Trafigura that those claims had not been transferred out of the Estates. If Trafigura thought the probate court erred by authorizing probate of assets that actually were not part of the Estates, they would have said so.

This is not to say that Escalon's interest as the beneficiary of the wills of Emma and Hilda was overridden by the Florida probate courts orders.  On this point, *Rice v. Green* is instructive. There, the Florida court distinguished between legal and equitable title to a decedent's property, finding that the decedent's wife "lacked marketable title to the property" because the will was never offered for probate. 941 So.2d 1230, 1231 (Fla. Dist. Ct. App. 2006). Although the wife held "equitable title to the property," that property was still subject to the administration of the estate. *Id.* So too here. Even if Escalon was immediately vested with the equitable title to Emma's and Hilda's claims when they died, she did not, and could not, hold or acquire the legal title because those claims remained subject to the administration of the Estates. The district court should have followed the Florida probate court's orders and found that legal title to Emma's and Hilda's claims continues to be part of their Estates and that Escalon is authorized to pursue those claims in her role as the Personal Representative.

**B.    The District Court Erred By Dismissing Emma's And Hilda's Claims Based On A Misconstruction Of Florida Probate Law**

As an alternative basis for dismissal, the district court cited *Seaboard Marine* for the proposition that Emma's and Hilda's claims must be dismissed because they did not become part of the Estates until Emma and Hilda passed away after the HBA's effective date (March 12, 1996). ROA.2857-2858. The district court's one-paragraph analysis on this point contravenes Florida probate law and erroneously adopts the same flawed rationale of *Seaboard Marine*.

**1.    Under Florida probate law, the Estates did not "acquire ownership" of the claims from Emma and Hilda**

Although the HBA requires a claimant to "acquire[] ownership of the claim before March 12, 1996," 22 U.S.C. §6082(a)(4)(B), it does not define "acquire," nor does it say anything about what happens to a trafficking claim when an owner who satisfies this provision later passes away after March 12, 1996. The term "acquire" carries its plain meaning. In the context of a claim by an heir (not an estate), the Fifth Circuit has held that "[t]he plain meaning of 'acquires' is 'to gain possession or control of; to get or obtain.'" *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 336 (5th Cir. 2021); *see also Garcia-Bengochea,* 57 F.4th at 930 (following *Glen's* interpretation in another case involving an heir claim).[3] This is in accord with both popular and

---

[3] *Glen* and *Garcia-Bengochea* deal with claims involving heirs, not estates. Neither Circuit has addressed an estate claim.

19

legal dictionaries defining "acquire" to mean to get it as one's own.[4] *See also Glen*, 7 F.4th at 336 (quoting Black's Law Dictionary and Webster's Third New International Dictionary). So, when the HBA uses the phrase "acquires ownership of the claim," it refers to the point when the claim holder obtains ownership of the claim as her own.

This ordinary meaning of acquire applies here. Under Florida law, estates do not and cannot "acquire ownership" of property or anything else in the sense that word is used in the HBA—*i.e.*, estates cannot obtain claims to confiscated property as their own. *See Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."). This is because an estate is not an entity or person capable of having anything as its "own." Rather, an "estate" is simply "the property of a decedent that

---

[4] At the time Title III was enacted in 1996, popular and legal dictionaries defined "acquire" in similar ways. *See* Acquire, *Oxford English Dictionary* (2d ed. 1989) ("To gain, obtain, or get *as one's own*, to gain the ownership of (by one's own exertions or qualities)" or "[t]o receive, or get *as one's own* (without reference to the manner), to come into possession of") (emphasis added); Acquire, *Black's Law Dictionary* (6th ed. 1990) ("To gain by any means, usually *by one's own* exertions; to get *as one's own*; to obtain by search, endeavor, investment, practice, or purchase; receive or gain in whatever manner; come to have.") (emphasis added). Contemporary dictionaries concur. *See, e.g.*, Acquire, *Webster's New World College Dictionary* (4th ed. 2004) (to "come to have *as one's own*") (emphasis added).

is the subject of administration."[5] Fla. Stat. § 731.201(14); *see also Wilkes v. United States*, No. 3:97-CV-1317-J-21A, 2000 WL 1367885, at *7 (M.D. Fla. Oct. 18, 2000) (describing estates as "merely the sum total of a deceased person's property" (quotation omitted)); Fla. Stat. § 731.201(32) ("Property" includes "causes of action of the estate and causes of action the decedent had at the time of death"). An estate is a legal fiction that describes the status of assets that have yet to be distributed.

The district court cited *Seaboard Marine* for the contrary, and incorrect, proposition. *Seaboard Marine* rests primarily on the erroneous conclusion that, at death, ownership of the decedent's trafficking claim is "acquired" by the decedent's estate. *Fernandez*, 2021 WL 4902506, at *5 ("Indeed, upon the death of each of the Blanco Rosell Siblings, their purported claims to the Confiscated Property 'became an asset of [their] [Estates].'" (citation omitted)). Under this reasoning, if death occurs after the March 12, 1996 bar date of the HBA, the claim is barred because the estate purportedly "acquired ownership" of the claim too late. But *Seaboard Marine's* interpretation of the relationship between the estate and the decedent's property misconstrues what the estate is under Florida law. Logically, if the estate *is*

---

[5] This is consistent with the nature of an estate in other jurisdictions too. *See, e.g.*, *Smith v. Cimmet*, 199 Cal. App. 4th 1381, 1390 (2011); *Est. of Tallman ex rel. Tallman v. City of Gastonia*, 682 S.E.2d 428, 434 (N.C. App. 2009); *Zaboth v. Beall*, 26 Va. Cir. 269, 1992 WL 884464, *1 (Va. 1992); *Republic Bankers Life Ins. Co. v. Bunnell*, 478 S.W.2d 800, 801 (Tex. Civ. App. 1972); *Matter of Tr. Est. of Renjes*, 42 Haw. 151, 163 (1957).

the property of the decedent, it cannot *acquire* that property. *See* Fla. Stat. §731.201(14); *see also* 33 C.J.S. Executors and Administrators § 5 ("The 'estate' of a deceased person is not a legal entity but is merely a name indicating the sum total of the decedent's assets and liabilities").

The Estates did not, and could not, acquire ownership of Emma's and Hilda's claims to the Confiscated Property, because they *are* Emma's and Hilda's claims. Because *Seaboard Marine's* holding cannot be squared with the legal nature of the Estates, *a fortiori*, neither can the district court's holding.

> **2.     Under Florida probate law, the Personal Representative stepped into Emma's and Hilda's shoes to bring the claims those decedents owned at death**

The district court's adoption of *Seaboard Marine's* misapprehension of the term "estate" under Florida probate law creates a conflict with the duty of the Personal Representative to prosecute Emma's and Hilda's claims on behalf of their Estates. "Under Florida law, 'it is well-settled that 'an 'Estate' is not an entity that can be a party to litigation. It is the personal representative of the estate, in a representative capacity, that is the proper party.'" *United States v. Est. of Schoenfeld*, 344 F. Supp. 3d 1354, 1367 (M.D. Fla. 2018) (quoting *Spradley v. Spradley*, 213 So.3d 1042, 1045 (Fla. 2d DCA 2017)). A personal representative "may properly … [p]rosecute or defend claims or proceedings in any jurisdiction for the protection of the estate, of the decedent's property …." Fla. Stat. § 733.612(20). And she is

authorized to "[s]atisfy and settle claims and distribute the estate as provided in this code." Fla. Stat. § 733.612(24); *see also All Children's Hosp., Inc. v. Owens*, 754 So. 2d 802, 806 (Fla. Dist. Ct. App. 2000) ("It is the general duty of the personal representative to settle and distribute the estate.").

Although the personal representative takes "possession or control" of "the decedent's property," Fla. Stat. § 733.607(1), she does not "gain ownership of" or "get" that property as her "own." The "estate assets are not the personal representative's property." *State v. Lahurd*, 632 So. 2d 1101, 1103 (Fla. Dist. Ct. App. 1994) (emphasis added). And while the personal representative has the authority to assert the decedent's rights in court, the representative merely "'stands in [the decedent's] shoes.'" *Sullivan*, 80 So. 2d at 707; *see also Magwood v. Tate*, 835 So. 2d 1241, 1243 (Fla. Dist. Ct. App. 2003) ("[I]t is essential to understand that the estate stands in the shoes of [the decedent].").

Relying on *Seaboard Marine*, the district court misconstrued the role of the personal representative, the estate, and the heir under Florida law. In the case of an "acquisition" of a claim by an heir—which is what the district court incorrectly found here[6]—the personal representative's authorization to "[p]rosecute or defend

---

[6] As discussed already, the Florida state probate court ordered Emma's and Hilda's claims to the Confiscated Property to be administered on behalf of their Estates. Those claims did not vest in Emma's and Hilda's heir.

claims" becomes superfluous if, as the district court held, the claim automatically vests in the heir, leaving nothing to prosecute on behalf of the estate.[7] Fla. Stat. § 733.612(20). In the case of an "acquisition" by the estate—the alternative scenario contemplated by the district court's dismissal order—the district court would put the personal representative in the role of an agent, with the estate as the principal that "acquires" the decedent's property. This is an impossibility because the estate is the decedent's property, and property is not a legal entity capable of being a principal and engaging an agent. A house does not hire a realtor, the owners of the house do.

The district court should have allowed the Personal Representative to do what Florida probate law and the Florida probate court authorized her to do—*i.e.*, step into Emma's and Hilda's shoes and prosecute their claims on behalf of their Estates. Emma and Hilda timely acquired ownership of those claims (ROA.2857), and the HBA's bar date is inapplicable to them. Relying on *Seaboard Marine*, the district court thwarted this straightforward application of Florida probate law by treating the Estates as having acquired ownership of the claims in their own right. This is contrary to Florida law, which clarifies that the estate includes "causes of action the

---

[7] Numerous administrative activities—such as liquidating assets, winding up contracts and business dealings, paying creditors, paying assessments and taxes, obtaining property insurance, pursuing claims, and employing professionals to assist with these activities—would be difficult, if not impossible, for the personal representative to perform if the estate was immediately divested of the decedent's property upon death. *See* Fla. Stat. §733.612 (authorizing the personal representative to take over two dozen actions to administer the estate).

decedent had at the time of death." Fla. Stat. § 731.201(32). Those causes of action are "subject to the strength and weakness *of the decedent's cause of action had [they] survived*." *Levy*, 210 So. 2d at 731 (emphasis added). Had Emma and Hilda survived, the strength of their causes of action would be measured by the date they acquired their claims to the Confiscated Property, which was before March 12, 1996. Because Emma and Hilda timely acquired ownership of their claims, the Personal Representative may pursue those claims on behalf of their Estates, and timeliness is no more a defense against the Personal Representative than it would have been against Emma and Hilda.

### 3.     The District Court relied on *Seaboard Marine's* misconstruction of Florida probate law

*Seaboard Marine* rested its contrary holding on two Florida decisions, neither of which supports dismissal. The first case, *Sharps v. Sharps*, 214 So. 2d 492 (Fla. Dist. Ct. App. 1968), involved an action brought by an estate's executor to recover a check the decedent received before he died, but which his wife deposited in her own account soon after he died. *Id.* at 493-94.

The *Sharps* court did not hold, as the district court assumed, that the estate "acquired" the check upon the husband's death. Just the opposite. The court explained that, unless the wife could prove that her husband "had made a gift of the check to her," it remained his property and thus "became an asset of the husband's estate" upon his death. *Sharps*, 214 So. 2d at 495; *see id.* (noting that "the wife still

held the husband's check" when he died). That entirely follows the statute's definition of an estate as "the property of a decedent." Fla. Stat. § 731.201(14).

The second decision, *Depriest v. Greeson*, 213 So. 3d 1022 (Fla. Dist. Ct. App. 2017), is no more supportive. That case involved a lawsuit filed against an estate and its personal representative for damages the plaintiff sustained when the decedent's daughter crashed his car soon after he died. *Id.* at 1025. The court explained that "[a]lthough the [father's] car was an asset of the estate, it did not belong to anyone individually." *Id.* at 1025.

The *Seaboard Marine* court thought that the decedents' assets had become property of their estates and "'no longer belonged to them individually.'" 2021 WL 4902506, at *1. That is not what *Depriest* says. By statute, the car—and every other asset of the estate—was "the property of a decedent that is the subject of administration." Fla. Stat. § 731.201(14). The issue before the court in *Depriest* was not whether the decedent owned the car. Rather, the issue was whether the car "belong[ed] to" the decedent's son or daughter. The court held that it belonged to neither because the car remained "subject to administration." *Depriest*, 213 So. 3d at 1025 (citing Fla. Stat. § 731.201(14)). "Ultimate ownership" would thus not be determined until the conclusion of the probate process. *Id.* at 1026.

**C.      Barring Claims Brought As Part Of The Administration Of Estates Would Undercut Title III's Purpose And Raise Serious Separation-Of-Powers Concerns**

The HBA's bar date was meant to "eliminate any incentive that might otherwise exist" for foreigners "to transfer claims to confiscated property to U.S. nationals in order to take advantage of the remedy created by" the Act. H.R. Rep. No. 104-202, at 40 (1995). That purpose is not served by preventing the personal representatives of estates of U.S. nationals who acquired their claims well before the bar date from asserting those claims under Title III. It undercuts Congress's stated intention to offer "fully effective remedies for the wrongful confiscation of property and for unjust enrichment from the use of wrongfully confiscated property" and to "deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(8),(11).

Giving effect to Congress's purposes here is important for another reason, too. Congress gave the President discretion to suspend Title III's private right of action, but it sharply constrained the President's authority to extinguish that right of action. Thus, the President may suspend Title III for six months at a time if he "determines" that doing so "is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba." 22 U.S.C. § 6085(c)(1)(B); *see id.* § 6064(a). But he may not terminate the right of action unless he determines that a democratically elected government has taken power in Cuba. *Id.* § 6082(h)(1)(B).

Interpreting the bar date to apply to estates of Castro's victims would upend the balance Congress struck. It would allow the Executive Branch effectively to extinguish Title III by attrition. It has nearly done so already. Until President Trump, successive presidential administrations had "suspended" the right to bring an action under Title III for some 23 years. Unsurprisingly, the revolution's immediate victims—exiled in the 1960s—have entered old age in that time. Many have died. Congress cannot have intended the bar date and suspension authority, working together, to allow the President to circumvent the restrictions it placed on his authority to terminate Title III's right of action.

## Conclusion

The district court's judgment should be reversed, and the case remanded for further proceedings.

Date: July 11, 2023

Respectfully submitted,

BERLINER CORCORAN & ROWE LLP

/s/ Jared R. Butcher
Jared R. Butcher
jbutcher@bcrlaw.com
David A. Baron
dbaron@bcrlaw.com
Melvin White
mwhite@bcrlaw.com
1101 17th Street, N.W., Suite 1100
Washington, D.C. 20036-4798
Tel:  (202) 293-5555
Facsimile:  (202) 293-9035

Counsel for Plaintiffs-Appellants

28

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2023, a true and correct copy of the foregoing Brief for Plaintiffs-Appellants was served via electronic filing with the Clerk of Court and all registered ECF users.

Upon acceptance by the Court of the e-filed document, 7 paper copies will be filed with the Court within the time provided in the Court's rules via Federal Express.

Dated: July 11, 2023

Respectfully submitted,

BERLINER CORCORAN & ROWE LLP

/s/ Jared R. Butcher
Jared R. Butcher
jbutcher@bcrlaw.com
David A. Baron
dbaron@bcrlaw.com
Melvin White
mwhite@bcrlaw.com
1101 17th Street, N.W., Suite 1100
Washington, D.C. 20036-4798
Tel:  (202) 293-5555
Facsimile:  (202) 293-9035

Counsel for Plaintiffs-Appellants

**CERTIFICATE OF COMPLIANCE**

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word.  Excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 6945 words.

Respectfully submitted,

BERLINER CORCORAN & ROWE LLP

/s/ Jared R. Butcher
Jared R. Butcher
jbutcher@bcrlaw.com
David A. Baron
dbaron@bcrlaw.com
Melvin White
mwhite@bcrlaw.com
1101 17th Street, N.W., Suite 1100
Washington, D.C. 20036-4798
Tel:  (202) 293-5555
Facsimile:  (202) 293-9035

Counsel for Plaintiffs-Appellants