**No. 23-20191**

In the

# United States Court of Appeals
## For the Fifth Circuit

HILDA M. CASTANEDO ESCALON; ESTATE OF HILDA CASTANEDO;
ESTATE OF EMMA DIAZ,

*Plaintiffs-Appellants,*

*v.*

TRAFIGURA TRADING L.L.C.; TRAFIGURA GROUP PTE LIMITED;
TRAFIGURA PTE LIMITED,

*Defendants-Appellees.*

From the United States District Court
for the Southern District of Texas, Houston
Honorable Alfred H. Bennett, District Judge
Case No. 4:21-cv-659

**BRIEF FOR DEFENDANTS-APPELLEES
TRAFIGURA TRADING LLC, TRAFIGURA GROUP PTE
LIMITED, AND TRAFIGURA PTE LIMITED**

Kathryn M. Barber
Alex J. Brackett
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-1227
F: (804) 698-2227

*Counsel for Appellees*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

No. 23-20191
*Castanedo Escalon, et al. v. Trafigura Trading L.L.C., et al.*

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Bennett, Alfred H., U.S. District Court Judge, Southern District of Texas

### <u>Defendants-Appellees</u>

- Trafigura Trading, LLC ("TTL")

  o TTL is a Delaware limited liability company, which is directly owned by Trafigura U.S., Inc. ("TUSI")[1], and is ultimately owned indirectly by Trafigura Group PTE Ltd. ("TGPL"), a Singapore company. TTL is not publicly traded.

- Trafigura PTE Ltd. ("TPTE")

  o TPTE is a Singapore company, which is ultimately owned indirectly by TGPL. TPTE is not publicly traded.

- Trafigura Group PTE Ltd. ("TGPL")

---

[1] TUSI is the highest level Trafigura entity in the United States.

i

- o TGPL is a Singapore company, which is the reference parent company and consolidating entity for the Trafigura "Group" of companies, of which TTL and TPTE are each a part. TGPL is not publicly traded.

- The Trafigura Group of companies operates within a private company structure and as an employee-owned company. The Trafigura Group of companies is exclusively owned by its management and key senior employees.

### Counsel for Defendants-Appellees

- Barber, Kathryn M.

- Brackett, Alex J.

- Madriz, Yasser A.

- McGuireWoods LLP

### Plaintiffs-Appellants

- Hilda M. Castanedo Escalon

- Estate of Hilda Castanedo

- Estate of Emma Diaz

### Counsel for Plaintiffs-Appellants

- Baron, David A.

- Berliner Corcoran & Rowe, LLP

- Butcher, Jared, R.

- Cunniff, Martin

- Eppler, Dale

- Fields PLLC

- Fields, Richard W.

- Lopez, Laina C.

- White, Melvin

*/s/ Kathryn M. Barber*
Kathryn M. Barber

*Attorney of Record for Appellees Trafigura Trading, LLC, Trafigura Group Pte Limited, and Trafigura Pte Limited*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendants-Appellees Trafigura Trading, LLC, Trafigura PTE Ltd., and Trafigura Group PTE Ltd. submit that oral argument is not necessary to affirm based on the District Court's well-reasoned orders. The appeal presents no substantial dispute of law, and the facts are straightforward.

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

STATEMENT OF THE ISSUES.................................................................3

STATEMENT OF THE CASE....................................................................4

I.    The Helms-Burton Act provides a cause of action only to those who timely acquired a claim to confiscated property........................................................4

II.   Escalon probated the testators' wills two decades after their deaths. ............6

III.  Escalon and the Estates sued the Trafigura entities. ......................................9

IV.   The District Court held that Plaintiffs lacked timely acquired claims to property...........................................................................10

SUMMARY OF ARGUMENT ...............................................................11

STANDARD OF REVIEW .....................................................................16

ARGUMENT ...........................................................................................16

I.    *Glen* decides this action. ...............................................................................16

II.   The District Court correctly held that any claims to the confiscated property vested in Escalon upon the testators' post-March 12, 1996 deaths...............18

      A.    The "claim to . . . property" Title III requires to be timely acquired is an ownership interest in property, not a cause of action. ................19

      B.    Under Florida law, any claims to property vested in Escalon after March 12, 1996....................................................................20

      C.    The District Court's correct reading of Florida law in no way contradicted the probate court's orders. .............................................21

III.  The District Court correctly held that the Estates do not contain any timely acquired claims to the confiscated property. ..................................................24

      A.    Estates are entities separate from their testators capable of "acquiring" claims to property. ...........................................................25

            1.    Estates can "acquire" claims to property under Title III. .........25

            2.    The District Court correctly interpreted Florida law to hold that the Estates acquired any assets not vested in Escalon. .............27

B.    Plaintiffs' proposed exception to *Glen*'s clear rule contravenes Title III's language and will undermine its operation. ........................29

C.    Reading Title III correctly to bar untimely acquisition by estates furthers congressional intent. .............................................................31

CONCLUSION ..........................................................................................33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Depriest v. Greeson*,
   213 So.3d 1022 (Fla. Dist. Ct. App. 2017)..............................................14, 28, 29

*Fernandez v. Seaboard Marine, Ltd.*,
   No. 20-cv-25176, 2021 WL 4902506 (S.D. Fla. Oct. 21, 2021)............11, 27, 30

*Garcia-Bengochea v. Carnival Corp.*,
   57 F.4th 916 (11th Cir. 2023) .............................................................................30

*Glen v. Am. Airlines, Inc.*,
   7 F.4th 331 (5th Cir. 2021) .........................................................................*passim*

*Glen v. Trip Advisor LLC*,
   529 F. Supp. 3d 316 (D. Del. 2021), *aff'd*, 2022 WL 3538221
   (3d Cir. Aug. 18, 2022)...................................................................14, 17, 25, 30

*Gonzalez v. Amazon.com, Inc.*,
   835 F. App'x 1011 (11th Cir. 2021) ..................................................................30

*Lampton v. Diaz*,
   639 F.3d 223 (5th Cir. 2011) .............................................................................16

*Rice v. Greene*,
   941 So.2d 1230 (Fla. Dist. Ct. App. 2006)......................................10, 13, 22, 23

*Sharps v. Sharps*,
   214 So.2d 492 (Fla. Dist. Ct. App. 1968).............................................14, 27, 28

*United States v. Lauderdale Cty., Mississippi*,
   914 F.3d 960 (5th Cir. 2019) .............................................................................16

*Matter of Wood*,
   643 F.2d 188 (5th Cir. 1980) .............................................................................20

**Statutes**

Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996
   (the Helms-Burton Act), 22 U.S.C. § 6021 *et seq*. .................................................4

22 U.S.C. § 6022 ....................................................................................4

22 U.S.C. § 6082 ............................................................................*passim*

22 U.S.C. § 6083(a)(1) .......................................................................6, 19

22 U.S.C. § 6085 ....................................................................................5

22 U.S.C. § 6091 ....................................................................................4

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1331 ....................................................................................3

28 U.S.C. § 1367(a) ...............................................................................3

Fla. Stat. § 731.201(32) .......................................................................26

Fla. Stat. § 732.514 .........................................................13, 20, 21, 22, 23

Fla. Stat. § 733.103 .........................................................................22, 23

Fla. Stat. § 733.612(5) .........................................................................26

**Other Authorities**

18 Fla. Jur. 2d Decedents' Property § 586................................................26

142 Cong. Rec. H1645-02 (Mar. 4, 1996) ..............................................19

*Acquire*, Black's Law Dictionary 29 (11th ed. 2019)...............................25

*Acquire*, Webster's Third New Int'l Dictionary 18 (1993) ......................25

K. DeYoung, *U.S. tightens Cuban embargo, allowing legal claims for
    confiscated property*, THE WASHINGTON POST (Mar. 4, 2019),
    https://www.washingtonpost.com/world/national-security/us-
    tightens-cuban-embargo-allowing-legal-claims-for-confiscated-
    property/2019/03/04/cd46595c-3ea3-11e9-922c-
    64d6b7840b82_story.html .................................................................5

H.R. Rep. No. 104-202 (1995)..........................................................29, 32

IRS, Responsibilities of an Estate Administrator,
    https://www.irs.gov/individuals/responsibilities-of-an-estate-
    administrator (last visited August 10, 2023) ......................................................26

*Statement on Action on Title III of the Cuban Liberty and Democratic
    Solidarity (LIBERTAD) Act of 1996*, 2 Pub. Papers 1136, 1137-38
    (July 16, 1996), *available at*
    https://www.govinfo.gov/content/pkg/PPP-1996-book2/pdf/PPP-
    1996-book2-doc-pg1136.pdf ................................................................................5

## **INTRODUCTION**

This Court has already decided that a person who inherits a claim to property after March 12, 1996 may not pursue an action for alleged trafficking in that property under Title III of the Helms-Burton Act. *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 336-37 (5th Cir. 2021). In *Glen v. American Airlines*, this Court ruled that Title III's bar on actions brought by those who "acquire[d] ownership" of a claim to confiscated property after March 12, 1996 broadly means that anyone who "gaine[d] possession or control" of the claim after that date untimely "acquired" it. *Id.* at 336. "Acquiring," this Court held, includes inheriting a claim or otherwise obtaining it "by operation of law." *Id.* That decision controls here, where the claims were "acquired" after 1996 by either the two estate Plaintiffs or their sole beneficiary. Plaintiffs are attempting a meritless end-run around this rule that hinges on misreadings of Florida law and Title III's unambiguous statutory text. This Court should reject this effort and affirm the District Court's correct decision that Plaintiffs lack any timely acquired claim, and their Title III action thus fails.

Plaintiffs are two estates ("the Estates") and Hilda M. Castanedo Escalon, the sole beneficiary of each Estate, acting in her capacity as the Estates' personal representative. The Estates' decedents, Hilda Castanedo and Emma Diaz, allegedly inherited ownership interests in property that the Cuban government confiscated in 1960. They both executed wills leaving all their property to Escalon, and both died

after March 12, 1996. Under Florida law, Escalon's rights to any purported claims to property the decedents had owned vested in her when the decedents died. Thus, under this Court's decision in *Glen*, Escalon untimely acquired those claims by inheritance.

*Glen* decides this case. But Plaintiffs think they have a workaround: belatedly opening estates in probate solely to litigate Title III causes of action. More than 20 years after both Castanedo and Diaz died, and only after being advised by Defendants' counsel that she faced a timely acquisition issue in any Title III action of her own, Escalon admitted the wills to probate and qualified as the Estates' personal representative. Plaintiffs now assert that the Estates have "retained"—yet somehow never "acquired"—the claims to property, such that the decedents' pre-1996 acquisition dates control and allow Escalon to bring a Title III action as the Estates' personal representative.

Plaintiffs are wrong as a matter of Florida probate law, Title III's statutory language, and common sense. Whichever person or entity has the claims now, those claims were acquired after Title III's cut-off date. The claims were either (1) inherited by Escalon when, under Florida law, they vested in her upon the testators' deaths or (2) acquired by the Estates when the testators died (and will ultimately be inherited by Escalon whenever probate closes). Either way, the claims were not timely acquired and are therefore not actionable.

Accepting Plaintiffs' contrary view would not only contravene Florida probate law and Title III's broad use of "acquire," but would create an unworkable and unfair two-tiered system. People who acquired claims to property by inheritance after March 12, 1996 would lack a Title III claim, but those who opened probate cases to litigate a Title III action would escape that bar—only to recover any damages award once the estate is ultimately closed, in the event they can otherwise prove their case. This scenario is not what Congress intended when it barred Title III actions based on late-acquired property claims. Nor is it what this Court intended when it decided that inheriting claims qualifies as "acquiring claims."

This Court should reject Plaintiffs' untenable reading of Title III and Florida law, and affirm the District Court's decision to dismiss.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). ROA.26, 28. The District Court granted Defendants' motions to dismiss on March 15, 2022. ROA.2852-58. Plaintiffs moved for reconsideration on April 13, 2022, ROA.2864-73, and the District Court denied the motion on March 29, 2023, ROA.2919. Plaintiffs timely appealed on April 26, 2023. ROA.2920-21. This Court has subject-matter jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.     Did the District Court correctly hold that any ownership interests in the

confiscated property vested in Escalon upon the testators' post-March 12, 1996 deaths, and thus were not timely acquired by any Plaintiff?

II.     Did the District Court correctly hold that any ownership interests held by the Estates were not timely acquired?

## STATEMENT OF THE CASE

**I.     The Helms-Burton Act provides a cause of action only to those who timely acquired a claim to confiscated property.**

In 1996, during one of many tense moments in U.S.-Cuba relations, Congress enacted and President Clinton signed into law the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (the Helms-Burton Act).  22 U.S.C. § 6021 *et seq*.  The Act broadly aims "to strengthen international sanctions against the Castro government," encourage a democratic transition in Cuba, and buttress U.S. national security.  *Id.* § 6022.  It sets out four titles addressing these goals.

Title I's provisions focus on strengthening the economic embargo against Cuba, while Title II's address a hopeful transition to a democractic Cuba.  Unlike these provisions targeting Cuba itself, Title III gives U.S. nationals a private right of action against any "person[s]" that "traffic[] in property which was confiscated by the Cuban Government."  *Id.* § 6082(a)(1)(A).  And Title IV calls for excluding from the United States anyone who confiscated a U.S. national's property or traffics in such property.  *Id.* § 6091.

Though Titles I, II, and IV immediately went into effect, Title III's private right of action did not.  The provision authorizes the President to suspend the cause of action for successive six-month periods if the "suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba." *Id.* § 6085(c)(1)(B), (c)(2).  President Clinton suspended Title III's private right of action upon its enactment "to maximize title III's effectiveness in encouraging [the United States'] allies to work with [the United States] to promote democracy in Cuba." *Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996*, 2 Pub. Papers 1136, 1137-38 (July 16, 1996), *available at* https://www.govinfo.gov/content/pkg/PPP-1996-book2/pdf/PPP-1996-book2-doc-pg1136.pdf.  Every subsequent administration did the same for the next 25 years—until 2019, when President Trump allowed the suspension to lapse.  K. DeYoung, *U.S. tightens Cuban embargo, allowing legal claims for confiscated property*, THE WASHINGTON POST (Mar. 4, 2019), https://www.washingtonpost.com/world/national-security/us-tightens-cuban-embargo-allowing-legal-claims-for-confiscated-property/2019/03/04/cd46595c-3ea3-11e9-922c-64d6b7840b82_story.html.

Title III's cause of action is now available, but the President retains discretion to resume its suspension at any time.  22 U.S.C. § 6085(c)(1), (2).  Further, Title III's cause of action is not designed to be perpetual.  It will expire when the President

5

determines that Cuba has transitioned to a democratically elected government.  *Id.* § 6082(h).  As these provisions reflect, Title III's private right of action is a uniquely political creature of statute that the President may wield in whatever way best serves the United States' interests.

Also reflecting this status are the restrictions on Title III's cause of action, even when not suspended.  Title III provides a civil remedy for money damages only to a U.S. national "who owns the claim to . . . property" that the Cuban Government "confiscated . . . on or after January 1, 1959."  *Id.* § 6082(a)(1)(A); *see id.* § 6083(a)(1) (the relevant "claim" is one to "ownership of an interest in property").  If that property was "consficated before March 12, 1996," as is alleged to have happened here, a U.S. national may only "bring an action under [Title III]" if "such national acquires ownership of the claim *before* March 12, 1996."  *Id.* § 6082(a)(4)(B) (emphasis added).

## II.  Escalon probated the testators' wills two decades after their deaths.

Despite Title III's restrictions, the years since 2019 have seen a slew of actions alleging trafficking liability—almost all of them unsuccessful.

This action is among them.  It centers on purported ownership interests in Minas de Matahambre, S.A., a "lead and zinc mining operation in Cuba," as well as the company's assets and associated entities and interests.  ROA.9.  The Castro

regime confiscated Minas de Matahambre and the other legal entities at issue in 1960.  ROA.9.

Hilda Castanedo and Emma Diaz—Escalon's mother and aunt, respectively— allegedly inherited ownership interests in the company from their father upon his death in 1962, along with rights to original shares of the company.  ROA.14, 16, 25-26.  They later immigrated to the United States and became naturalized citizens. ROA.10-11.

In early 1996, both women executed near-identical wills.  ROA.37, 50.  Both wills stated that, apart from any "list disposing of . . . tangible personal property" the women might leave at their death, Castenedo and Diaz bequeathed "[a]ll the rest, residue, and remainder of [their] estate, real or personal, wheresoever situated" to Escalon, their sole heir and the eventual personal representative of their estates. ROA.37, 50.

Diaz died several months after executing her will, on July 27, 1996.  ROA.42. Castanedo followed on June 6, 2000.  ROA.55.  Escalon did not admit the wills to probate at the times of Castanedo's and Diaz's deaths.  Absent from the Complaint is any discussion of what, if any, property existed at their deaths aside from purported Title III causes of action or how Escalon disposed of such property.

In 2019, after Title III's suspension had lapsed, Escalon (through counsel) sent multiple pre-litigation letters to Defendants Trafigura PTE, Ltd. ("TPTE") and

Trafigura Group PTE, Ltd. ("TGPL") informing them that she intended to sue them as a "claimant" under Title III. ROA.154, 163. In these letters, Escalon asserted that TPTE and TGPL were "trafficking in *her* confiscated property." ROA.154, 163 (emphasis added). TPTE and TGPL responded (through counsel) and identified, among other flaws, "standing issues" fatal to Escalon's asserted claims—including her failure to timely acquire any claim to the confiscated property. ROA.172.

In July 2020, only *after* TPTE and TGPL informed Escalon of the timely acquisition issue she faced, and *more than 20 years* after Castanedo's and Diaz's deaths, Escalon petitioned to admit Castenedo and Diaz's wills to probate and to qualify as the Estates' personal representative. ROA.31-35, 44-48. Escalon listed as each Estate's sole asset a "[r]ight to pursue a cause of action pursuant to [the Helms-Burton Act]." ROA.35, 48. The probate records list no other assets.

The Miami-Dade County probate court admitted the wills to probate. ROA.42-43, 55-56. The court's orders directed that the wills were "admitted to probate" and Escalon was "appointed personal representative" of the estates. ROA.42-43, 55-56. The probate court's orders did not address the claimed assets other than to direct Escalon to deposit any liquid assets. ROA.42-43, 55-56.

Once the wills were admitted to probate, Escalon's counsel contacted TPTE and TGPL's counsel again. Counsel asserted that they had "a very different case than what [they had] presented" in 2019. ROA.172. That is, the purported claimants

were now "the Estates of Hilda Castanedo . . . and Emma Diaz," rather than Escalon herself.  ROA.173.

## III.    Escalon and the Estates sued the Trafigura entities.

The newly created Estates, along with Escalon in her capacity as personal representative, sued under Title III.  Plaintiffs named TGPL, TPTE, and Trafigura Trading, LLC ("TTL") as Defendants.  ROA.279, 291.  Plaintiffs alleged that TGPL, TPTE, and TTL are trafficking in confiscated property due to their alleged involvement in EMINCAR, a joint venture with Cuba's government-owned mining company Geominera.  ROA.12.  According to Plaintiffs, EMINCAR operates a lead and zinc mine located in part on the property that the Castro regime allegedly confiscated from Minas de Matahambre.  ROA.12, 21-23.  Plaintiffs also alleged that Defendants engaged in a related civil conspiracy.  ROA.28-29.

Defendants moved to dismiss both counts on multiple grounds, including the lack of personal jurisdiction over TGPL and TPTE, lack of injury traceable to TTL, Plaintiffs' failure to adequately plead actual ownership interests in the confiscated property or knowing and intentional trafficking, and failure of the civil conspiracy claim.  ROA.142-46, 149-50, 803-08, 810-13.

Defendants also argued that Plaintiffs lacked any timely acquired claim to the confiscated property because any claims to that property vested in Escalon upon Castanedo's and Diaz's post-March 12, 1996 deaths.  ROA.140-41, 808-09.  Further,

even if the Estates still held the claims, the Estates did not acquire any claims until the testators died—meaning after March 12, 1996. ROA.141, 809.[2]

## IV. The District Court held that Plaintiffs lacked timely acquired claims to property.

The District Court granted the motions to dismiss, ROA.2852-58, holding that, under Florida probate law, "any rights [Castanedo and Diaz] had to the Confiscated Property vested in Escalon on the dates of their deaths," ROA.2857. The timing of any later probate proceedings did "not affect when Escalon's right to the Confiscated Property vested." ROA.2857 (citing *Rice v. Greene*, 941 So.2d 1230, 1231 (Fla. Dist. Ct. App. 2006)). And because Escalon had this vested right at the time of the testators' deaths, the Estates lacked any "ownership interest in the Confiscated Property." ROA.2587.

The District Court further reasoned that even if Castanedo's and Diaz's ownership interests had not vested in Escalon upon their deaths, "their purported claims to the Confiscated Property were not part of their respective Estates before the statutory cutoff" because they did not die until after March 12, 1996. ROA.2857-

---

[2] While the parties were briefing the motions to dismiss, Escalon was neglecting the probate case. The probate court ordered her to progress the cases and then ordered them closed when she failed to do so. ROA.2898. A full *two months later*, Escalon petitioned to reopen the cases, and the court granted her motions. ROA.2902, 2905, 2908, 2911. Escalon thus spent three months litigating this action on behalf of estates that the Florida probate court had closed.

58 (quoting *Fernandez v. Seaboard Marine, Ltd.*, No. 20-cv-25176, 2021 WL 4902506, at *5 (S.D. Fla. Oct. 21, 2021)).  The Estates thus contained no assets until the testators' deaths.  ROA.2857-58.  The court therefore dismissed the Title III claims.

The court also granted the motions to dismiss as to the civil conspiracy claim because Plaintiffs failed to state a claim for violating Title III and that was "the only underlying claim" supporting the derivative tort of civil conspiracy.  ROA.2858.

Plaintiffs moved for reconsideration, which the District Court denied, holding that the reasoning in its initial order "remain[ed] valid."  ROA.2919.  This appeal followed.

The District Court did not decide the personal jurisdiction question or the additional Rule 12(b)(6) grounds the motions to dismiss raised; if this Court does not affirm, it should remand for the District Court to consider those other bases for dismissal.

## SUMMARY OF ARGUMENT

Every court to address the issue, including this one, has held that a claim to property inherited after March 12, 1996 is not timely acquired under Title III.  Plaintiffs want to carve out an extratextual exception to this straightforward rule for estates.  This proposed exception would contravene Florida probate law and Title III's requirements, and it should fail on appeal as it did before the District Court.

This Court should affirm the District Court's correct ruling that Plaintiffs' Title III action fails for lack of a timely acquired claim to property.

I.     This Court has already decided the fundamental question this appeal presents: whether Title III's bar on actions involving untimely "acquired" claims to property bars claims that are inherited or otherwise passed from one person or entity to another "by operation of law." *Glen*, 7 F.4th at 336.  As this Court held in *Glen*, it does.  That holding controls here.

Castanedo and Diaz do not possess claims to property anymore because they are deceased.  Some other person or entity has those claims.  That person or entity "acquired" them after Castenedo and Diaz's post-March 12, 1996 deaths, either by inheritance (Escalon) or similar "operation of law" (the Estates) that will ultimately lead Escalon to inherit the claims.  This conclusion is sufficient basis for this Court to affirm the District Court's dismissal.

II.    Should the Court need to look beyond *Glen*, Florida law and Title III's terms confirm that either Escalon or the Estates untimely acquired the claims and that Plaintiffs thus present no viable Title III action.

A.     The claims to property at issue are an element of a Title III cause of action—they are not a cause of action themselves.  Escalon's authority as personal representative to pursue causes of action on the Estates' behalf is thus irrelevant to

the controlling question here: whether the Estates have any timely acquired claim to property necessary to support a Title III cause of action.  They do not.

B.     Under Florida law, "[t]he death of the testator is the event that vests the right to devises unless the testator in the will has provided that some other event must happen before a devise vests."  Fla. Stat. § 732.514.  The wills devised all property to Escalon, without condition.  The right to that property therefore vested in Escalon when the testators died, meaning Escalon acquired the claims to property by inheritance after March 12, 1996—a fact she agreed with until she realized it defeated any Title III action she might bring in her own capacity.  Escalon has no timely acquired claim to property, *Glen*, 7 F.4th at 336-37, and none reside in the Estates.

C.     In reaching this correct conclusion, the District Court in no way contradicted the state probate court's pro forma orders admitting the wills to probate and appointing Escalon personal representative.  Those orders did not, and could not, rule that the Estates held any actionable claims to property or cognizable causes of action.  Indeed, probate simply validates wills and allows the personal representative to administer and settle an estate.  It does not negate a beneficiary's vested rights in devises. *See Rice*, 941 So.2d at 1231-32.  Nor does it confirm that a personal representative has any valid causes of action to pursue on the estate's

behalf. Because the Estates lack any timely acquired claims to property, Escalon has no viable Title III claim to pursue as their personal representative.

III.   This Court may also affirm because the District Court correctly held that even if the Estates possess the claims to property in some form, they did not timely acquire those claims.

A.   Estates are plainly capable of "acquiring" claims to property within Title III's broad use of that term. "Acquisition" under Title III simply means to "come into possession, control, or power of disposal of" by any manner. *Glen*, 7 F.4th at 336; *see Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316, 328 (D. Del. 2021), *aff'd*, 2022 WL 3538221 (3d Cir. Aug. 18, 2022) (unpublished) ("acquire" includes "inheritance or any other manner" of acquisition). Estates are entities separate from their decedents and are composed of the decedents' property. When the decedents die, that property becomes the estate's property—it is no longer the decedent's. Estates thus "acquire" property upon their decedents' deaths. And the Estates here so acquired Castanedo's and Diaz's claims to property upon their post-March 12, 1996 deaths (to the extent that those claims had not vested in Escalon).

Florida law confirms this view. Florida courts have repeatedly characterized the transfer of assets from a decedent to her estate as occurring at the moment of the decedent's death, "in the twinkling of a legal eye." *Sharps v. Sharps*, 214 So.2d 492, 495 (Fla. Dist. Ct. App. 1968); *Depriest v. Greeson*, 213 So.3d 1022, 1024 (Fla. Dist.

Ct. App. 2017). These decisions confirm that estates, separate from their decedents, "possess or control" property until it is distributed or settled. Thus, if the claims to property remain in the Estates in any form, they are the Estates' assets, not the decedents'. And they were not timely acquired, meaning the Estates lack any viable Title III claim that Escalon can pursue on their behalf.

B.     Adopting Plaintiffs' contrary view of the law—and letting estates pursue Title III actions when post-March 1996 inheritors cannot—would undercut Title III's framework. As this Court decided in *Glen*, Title III broadly prohibits untimely acquisition in any form. There is no reason to treat estates differently than inheritors with respect to this rule—especially because those inheritors will ultimately benefit from any Title III action an estate can pursue.

This broad acquisition bar aligns with Title III's design. Title III's private right of action is not meant to be an expansive remedy available in perpetuity. It is a restricted and uniquely political provision—one that the President can suspend at any time, indefinitely, if necessary to protect U.S. interests or help achieve democratic transition in Cuba. That administrations did so for more than 25 years, thus reducing the number of viable Title III actions, is simply the statutorily designed cost of the authority Title III entrusted to the Presidency. It is not a flaw to be fixed, especially not in a way that offends relevant state law and Title III's provisions. This Court should affirm.

## STANDARD OF REVIEW

This Court reviews "de novo the grant of a Rule 12(b)(6) motion to dismiss." *Lampton v. Diaz*, 639 F.3d 223, 225 (5th Cir. 2011).  It also reviews de novo questions of statutory interpretation.  *United States v. Lauderdale Cty., Mississippi*, 914 F.3d 960, 964 (5th Cir. 2019).

## ARGUMENT

This Court should decline Plaintiffs' invitation to ignore its holding in *Glen* and should affirm the District Court's correct order dismissing the action.

## I.    *Glen* decides this action.

This appeal presents a question that this Court has already decided: whether Title III's term "acquires" includes inheriting or otherwise gaining possession of claims to property upon another person's death.  As this Court held in *Glen*, the answer is yes.  That rule controls here.  Whatever person or entity holds the alleged ownership interests at issue, those interests were acquired after March 12, 1996 and do not support a Title III action.

In *Glen*, the plaintiff "allege[d] that he inherited an ownership interest in" confiscated properties "when his aunt passed away in 1999" and his mother died "in 2011."  7 F.4th at 333-34.  This Court held that his claim "fail[ed] on the merits" because he "inherited the properties after 1996" and thus untimely "acquired" them after 1996.  *Id.* at 336-37.

16

In reaching this conclusion, the Court rejected the plaintiff's argument "that the word 'acquires' doesn't mean what it says"—that is, that the term does not include "a mere passive event, such as inheriting a claim by operation of law from close family." *Id.* at 336. "[T]he plain meaning of 'acquires,'" the Court held, "is 'to gain possession or control of; to get or obtain.'" *Id.* And that meaning "includes inheritance." *Id.* Indeed, as another court has put it, "[t]he statute makes no distinctions with respect to the method of acquiring the claim." *Trip Advisor LLC*, 529 F. Supp. 3d at 328.

This Court reasoned that had Congress wished to limit "acquire" to more "active" forms of conduct, it knew how to—in fact, Congress separately prohibited acquisition "by assignment for value" of claims to property confiscated after 1996. *Glen*, 7 F.4th at 336; *see* 22 U.S.C. § 6082(a)(4)(C). But Congress left "acquire" broad in its timely acquisition provision for property confiscated before 1996, such that the term includes "passive acquisition" "by operation of law." *Id.* This conclusion, the Court observed, was consistent with that of every other court "to address the issue." *Glen*, 7 F.4th at 336 (collecting cases).

Such untimely acquisition is exactly what happened here, either to Escalon or the Estates. Castanedo and Diaz no longer possess the alleged claims to property, as they are deceased (nor do Plaintiffs assert that the testators still possess the claims in any relevant sense). So someone or something else must possess or exercise

control over them.  That is, some other person or entity must have "acquired" them within Title III's meaning—likely "by operation of law" because they (1) inherited them or (2) obtained them as estate assets to be devised by inheritance after probate.

Whatever person or entity currently controls the claims could not and did not possess them until Castanedo and Diaz died, in both cases after March 12, 1996.  So the claims here—if they exist—were untimely acquired after that date.  That fact alone is sufficient for this Court to affirm the decision below.  No one, including Plaintiffs, holds timely acquired claims to property, so no Title III action is viable. The District Court's dismissal should be affirmed.

## II.     The District Court correctly held that any claims to the confiscated property vested in Escalon upon the testators' post-March 12, 1996 deaths.

Even if the Court needs to look beyond *Glen*'s straightforward application to the facts here, Florida law and its interaction with Title III make clear that either (1) Escalon untimely acquired the claims as the Estates' sole beneficiary at the testators' deaths or (2) the Estates acquired the claims at that time (and will ultimately distribute the claims to Escalon as their sole, uncontested beneficiary). Plaintiffs' contrary assertions (1) conflate the "claim . . . to property" that Title III requires litigants to acquire before March 12, 1996 with a cause of action, (2) misrepresent the probate court's straightforward orders, and (3) misconstrue Florida probate law.

### A.    The "claim to . . . property" Title III requires to be timely acquired is an ownership interest in property, not a cause of action.

A central flaw pervades Plaintiffs' arguments and the probate action underlying the same: they confuse (1) the property claim that Title III requires litigants to timely acquire with (2) causes of action a personal representative may pursue on an estate's behalf, whether under Title III or otherwise.

Title III provides a remedy only to those U.S. nationals who own a timely acquired "claim to [confiscated] property." 22 U.S.C. § 6082(a). This "claim" is a "property claim" reflecting "ownership of an interest in property." 142 Cong. Rec. H1645-02 (Mar. 4, 1996); 22 U.S.C. § 6083(a)(1). It is not a cause of action; it "is an *element* of a Helms-Burton Act claim." *Glen*, 7 F.4th at 335 (emphasis added). Only if the U.S. national timely acquired the property claim may she "bring an action . . . on [that] claim" under Title III. 22 U.S.C. § 6082(a)(4)(B). Title III thus distinguishes between (1) the claim to property that must be acquired before March 12, 1996, and (2) the cause of action Title III provides a U.S. national who timely acquired that claim (and meets the other statutory requirements).

Plaintiffs fail to grasp this distinction. They argue that Escalon, as the Estates' personal representative, may pursue "causes of action the decedent[s] had at the time of death," restricted only by the "strength and weakness of the decedent[s'] cause of action had [they] survived." Opening Br. 14-15. Of course she may—though of course, Castanedo and Diaz could not pursue any Title III cause of action (nor had

they) when they died, because the cause of action was suspended. *Supra* at 5, 7; *Matter of Wood*, 643 F.2d 188, 190 (5th Cir. 1980) (survivability of a federal cause of action "is a matter of federal law"). In any event, that Escalon has the power to pursue *causes of action* says nothing about whether the Estates have the timely acquired *property claims* necessary to make any Title III cause of action viable. They do not.[3]

**B.  Under Florida law, any claims to property vested in Escalon after March 12, 1996.**

The Estates lack claims to the confiscated property because, as the District Court correctly held, those claims vested in Escalon when each testator died.

Florida law provides that "[t]he death of the testator is the event that vests the right to devises unless the testator in the will has provided that some other event must happen before a devise vests." Fla. Stat. § 732.514. Castanedo's and Diaz's wills bequeathed all their property to Escalon (except for any list of personal property; neither testator is alleged to have left one). ROA.37, 50. The wills do not provide that any event must occur before those devises vest in Escalon. ROA.37,

---

[3] In fact, there is reason to question whether the alleged property claims were ever part of the Estates at all. Escalon represented to the probate court that the *only* asset in each Estate is the "[r]ight to pursue a cause of action pursuant to the [Helms-Burton Act]." ROA.35, 48. She did not mention any underlying claim to or interest in confiscated property. On a plain reading of the probate records, then, any claims to property interests were either not owned by the testators or already passed to Escalon in her capacity as sole beneficiary.

50.  Thus, Escalon's rights to Castanedo's and Diaz's property vested when each woman died.  Fla. Stat. § 732.514.  They do not remain in the Estates.

Each testator died after March 12, 1996, so Escalon acquired any property claims by inheritance after that date.  Escalon therefore owns those claims, if any exist, and cannot bring a Title III action based on them.  *See Glen*, 7 F.4th at 336-37.  And neither can Plaintiffs, because the claims are owned by Escalon in her personal capacity and not held by the Estates.

### C.    The District Court's correct reading of Florida law in no way contradicted the probate court's orders.

This conclusion—rightly reached by the District Court—neither negates the probate court's orders nor undermines their appointment of Escalon as personal representative.    Plaintiffs vastly overread those pro forma documents and misrepresent their import.  In them, the court simply admitted the wills to probate.  ROA.42-43, 55-56.  The orders did not address the sole purported asset—a Title III cause of action—that Escalon claimed both Estates held.  Nor did the orders somehow sanction that cause of action as viable, much less rule that the Estates owned the claims to property necessary to maintain it.  Indeed, the probate court *could not do so* without contravening both (1) Florida's rule that those property interests vested in Escalon upon the testators' deaths and (2) Title III's terms.

In arguing otherwise, Plaintiffs misunderstand the purpose and effect of probate, as well as Florida's treatment of property rights devised by will.  When a

will devises property, the right to that property vests in the beneficiary when the testator dies, unless the will provides otherwise (and the wills here do not). Fla. Stat. § 732.514. The beneficiary therefore has title to that property as soon as the testator dies—meaning she owns the claim to property upon the testators' deaths. *Rice*, 941 So.2d at 1231.

The beneficiary cannot *prove* that title or ownership, however, unless the will has been admitted to probate. Fla. Stat. § 733.103(1) ("Until admitted to probate . . . , the will shall be ineffective to prove title to, or the right to possession of, property of the testator."). Probate thus validates a will and distributes assets. And it allows the beneficiary to prove her ownership should it be challenged. But the beneficiary's inability to prove ownership before probate does not negate her already-vested ownership rights.

*Rice v. Greene* makes this fact clear—though Plaintiffs misread the case. Opening Br. 18. There, two men (Rice and Greene) separately purchased the same parcel of real property from Virginia Schwartz. 941 So.2d at 1230. Schwartz's husband had devised all his property to her in his will, but she never probated the will. *Id.* Instead, after her husband's death, Schwartz executed a deed conveying the parcel to Rice, which he did not record. *Id.* at 1230-31. She later conveyed a deed to the same parcel to Greene and he recorded it, meaning Florida's recording act gave him a superior right to the property. *Id.* at 1231. Rice argued that Florida's

recording act did not apply, however. *Id.* In his view, without a probated will, Schwartz lacked title to and could not validly convey the property. *Id.*

The court rejected this view. In doing so, it reconciled § 733.103's rule that a will is ineffective to prove title until probated with § 732.514's rule that devises vest in the beneficiary at the testator's death. Though the "unprobated will was ineffective to 'prove title' to the property," the court explained, "it was [the husband's death] that vested Mrs. Schwartz's rights in the property." *Id.* "Reading these statutes in concert," it was clear that, under § 732.514, Schwartz had equitable title sufficient to convey the property to Greene, such that Greene's earlier recording gave him priority over Rice (though more work was needed to get Greene marketable title to the property). *Id.* at 1231-32.

Contrary to Plaintiffs' assertion, Opening Br. 18, the court did *not* hold that the property remained in the husband's unprobated estate. Instead, the court held that Schwartz had sufficient title to convey the property to Greene, though that title would need to be perfected to avoid future issues.

Like Schwartz's title, Escalon's rights in the testators' property vested when Castanedo and Diaz died—a fact she embraced until she realized it would defeat any Title III action in her personal capacity. *Supra* at 7-8. She could not have *proved* that ownership without probating the wills—and thus would likely have faced that

23

added hurdle in any personal Title III action—but she still held a vested property right in them as soon as the testators died.

This fact does not make Escalon's role as personal representative "superfluous." *Contra* Opening Br. 24.  Again, Plaintiffs confuse the nature of the "claims" at issue.  Escalon remains authorized to prosecute causes of action on the Estates' behalf (and take other necessary steps towards administering the Estate, though she does not appear to have done so).  But a Title III action brought by Escalon as the Estates' personal representative is viable only if based on timely acquired claims to property.  Because Escalon, rather than the Estates, owns any such claims, there is no viable Title III action for the Estates to pursue.

Nor could the probate court "rule[]" that the purported Title III causes of action listed as estate assets were viable.  *Contra* Opening Br. 17.  That was the District Court's role.  There is no contradiction between the courts' orders.

 The District Court's correct decision that those rights vested in Escalon after March 12, 1996 and are not owned by the Estates thus adheres to Florida probate law and the probate court's orders.   This Court should affirm.

## III.    The District Court correctly held that the Estates do not contain any timely acquired claims to the confiscated property.

This Court may also affirm because even if Castanedo's and Diaz's asserted claims to property reside in the Estates in some form, the Estates did not timely acquire those claims.  Plaintiffs' efforts to escape this conclusion contradict both this

Court's interpretation of Title III and Florida law. And the tactic they adopt to circumvent *Glen*'s controlling rule—avoiding untimely acquisition by inheritance by belatedly probating estates with a single purported asset (and single unchallenged beneficiary)—would create incongruous results across Title III actions and undermine Congress's intent. This Court should reject this misguided workaround to *Glen* and confirm that property rights acquired after 1996—by whatever method or entity—are untimely acquired for purposes of Title III.

### A.     Estates are entities separate from their testators capable of "acquiring" claims to property.

#### 1.     Estates can "acquire" claims to property under Title III.

As this Court decided in *Glen*, Title III's term "acquire" simply means "to gain possession or control of; to get or obtain." *Glen*, 7 F.4th at 336 (quoting *Acquire*, Black's Law Dictionary 29 (11th ed. 2019); Webster's Third New Int'l Dictionary 18 (1993)). Title III does not distinguish between "method[s] of acquiring the claim," it just broadly prohibits Title III actions based on claims acquired after March 12, 1996 through "inheritance or any other manner." *Trip Advisor LLC*, 529 F. Supp. 3d at 328.

Estates, under Florida law, are plainly capable of "acquiring" claims to property under Title III's expansive use of the term. That an estate is essentially an aggregation of a decedent's property does not change this fact (nor do Plaintiffs provide any authority supporting their illogical assertions that it does, *see* Opening

Br. 20-22). Instead, this description of an estate simply confirms that the estate is an entity distinct from the decedent. The estate is the decedent's *property*, not the decedent herself in some other form.[4] 18 Fla. Jur. 2d Decedents' Property § 586 ("The estate of a decedent is an *entity* which comprises all property in the broad sense of the word which a decedent has at death." (emphasis added)). The decedent no longer exists and can no longer own any property upon her death; her property immediately accumulates in her separate estate—by operation of law—to be settled and distributed.

Thus, when the decedent dies, the assets immediately belong to the estate (to the extent not vested in the devisees). And the estate, through the personal representative, can continue to "[a]cquire or dispose of [estate] asset[s]" throughout probate. Fla. Stat. § 733.612(5). Accordingly, the estate is an entity distinct from the decedent that "acquires" the decedent's property upon her death and holds it until it can be distributed to her beneficiaries.

---

[4] Because estates are separate from their decedents, the Florida probate code recognizes that there may be "causes of action of the estate" the estate holds itself that are distinct from "causes of action the decedent had at the time of death." Fla. Stat. § 731.201(32). Also reflecting this separateness, the decedent and the decedent's estate are separate taxpayers with distinct taxpayer identification numbers. *See*, *e.g.*, IRS, Responsibilities of an Estate Administrator, https://www.irs.gov/individuals/responsibilities-of-an-estate-administrator (last visited August 10, 2023).

Therefore, to the extent that the testators' assets did not immediately devise to Escalon upon their deaths, the Estates "acquired" them by operation of law at the testators' post-March 12, 1996 deaths.

### 2.     The District Court correctly interpreted Florida law to hold that the Estates acquired any assets not vested in Escalon.

Plaintiffs try to downplay the relevant Florida case law on this issue, but when correctly read it confirms that the Estates "acquired" any assets that did not vest in Escalon; those assets did not somehow remain "Emma's and Hilda's claims" after their deaths.  *Contra* Opening Br. 22.  The District Court, in citing to the *Seaboard Marine* decision addressing whether estates "acquire" claims within the meaning of Title III, correctly read Florida law to reach this conclusion.   ROA.2857-58.

*Seaboard Marine* relied on two Florida decisions that reflect (1) an estate's separate nature and (2) its ability to "acquire" the decedent's property at her death.  *See* 2021 WL 4902506, at *4-5.  In *Sharps v. Sharps*, the court held that a check made out to the decedent but not deposited before his death became "an asset of [his] estate" "[u]pon his death, in the twinkling of a legal eye." 214 So.2d at 495.  Because the check had become the estate's property at the decedent's death, his wife could not deposit the check unless she showed he had previously gifted it to her.  *Id.*

Contrary to Plaintiffs' assertion, the *Sharps* court did *not* hold that the check "remained [the decedent's] property." Opening Br. 25.  Quite the opposite: the court made clear that the check was "an asset of [the decedent's] *estate*." *Sharps*, 214

So.2d at 495. That is, the *estate*, an entity separate from the decedent, gained possession or control of that check at the moment of the husband's death. The estate "acquired" it.

The same was true in *Depriest v. Greeson*, where the decedent's will named his daughter and stepson as co-equal beneficiaries. 213 So.3d at 1024. Before the will was probated, the daughter got in a car crash driving the decedent's car that resulted in a lawsuit against the estate. *Id.* In addressing who owned the car at the time of the crash, the court rejected the idea that "the estate had no legal ownership interest" in the car. *Id.* at 1025. It held that "[w]hen [the] Decedent died, 'in the twinkling of a legal eye,' the car became an asset of his estate." *Id.* (quoting *Sharps*, 214 So.2d at 495). And because the car was the *estate's* asset (not the decedent's), and the will did not specifically devise the car, the car "did not belong to anyone individually." *Id.* Instead, it belonged to the estate and was to be administered in the estate's best interests. *Id.* As the court reasoned, it could even be "sold to pay the estate's obligations," at which point it would "no longer belong[] to the estate." *Id.* at 1026.

Contrary to Plaintiffs' characterization, Opening Br. 26, *Depriest* did not hold that no one, not even the estate, owned the car until the estate was fully administered. Rather, *Depriest* reflects that the estate owned the car at the time of the lawsuit. Whether one beneficiary or the other (or neither) would ultimately become the owner

could not be determined until probate concluded.  213 So.3d at 1026.  Until probate closed, however, and unless the car was disposed of before then, the car was the estate's asset.  *See id.* at 1025-26.[5]

Florida law thus makes clear that estates can "possess or control" property in the necessary sense, such that they can "acquire" claims under Title III.  If the claims remain in the Estates in some form (and of course, the probate filings do not even reflect that they do), they are the Estates' assets that the Estates did not acquire until Castanedo and Diaz died.  Thus, the Estates lack timely acquired claims to property and their Title III action fails on the merits.

### B.    Plaintiffs' proposed exception to *Glen*'s clear rule contravenes Title III's language and will undermine its operation.

Plaintiffs' contrary view of acquisition departs from Title III's language and purpose.  This Court has already rejected the idea that "acquiring" claims under Title III encompasses some forms of transfer but not others.  *Glen*, 7 F.4th at 336.  The timely acquisition provision aimed "*in part*[] to eliminate any incentive that might otherwise exist to transfer claims to confiscated property to U.S. nationals," whether for value or because the original claimant was a foreign national.  H.R. Rep. No. 104-202, at 40 (1995) (emphasis added).  But that was not its *entire* purpose.  Indeed,

---

[5] But the estate's acquisition of the car did not mean the estate was responsible for the accident, because there was no showing of implied consent for the daughter to drive the car.  *Id.* at 1026-28.

the statute did not exclusively bar transfers for value or transfers from a foreign national—it went much further than that. Its broad language thus reflects other potential motivations beyond just eliminating incentives to transfer claims, including "limit[ing] the extent to which federal courts will need to delve into intricacies of state inheritance laws." *Trip Advisor LLC*, 529 F. Supp. 3d at 330.

And this Court has already expressly held, as has every other court to confront the question, that acquiring ownership by inheritance falls within Title III's expansive prohibition. *See Glen*, 7 F.4th at 336-37; *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 930-31 (11th Cir. 2023); *Gonzalez v. Amazon.com, Inc.*, 835 F. App'x 1011, 1012 (11th Cir. 2021); *Fernandez*, 2021 WL 4902506, at *4; *Trip Advisor LLC*, 529 F. Supp. 3d at 331. That rule bars Escalon from directly pursuing a Title III action in her personal capacity. The same must be true for the Estates, particularly because their ultimate purpose is to distribute all the Estates' property (*i.e.*, through inheritance) to their sole beneficiary, Escalon. Applying a different rule to estates than applies to heirs would constrict the broad reading this Court has already given Title III and would undermine Congress's intent in requiring timely acquisition.

It would also lead to arbitrarily incongruous results. Under Plaintiffs' proposed framework, if one testator's will devising claims was promptly probated after her post-March 12, 1996 death and her estate distributed, her beneficiaries

would be unable to pursue Title III actions based on those claims. But if the beneficiaries decide to admit the will to probate, they will satisfy Title III's timely acquisition requirement (under Plaintiffs' incorrect view). Yet after litigation, the estate will be closed and the assets distributed to those same beneficiaries. Parties who would otherwise be barred from pursuing an action under *Glen* will receive the damages award (if any) from any successful Title III action brought by the estate.

If Plaintiffs' arguments are adopted, beneficiaries who follow the correct course will lack a Title III claim, while those who misuse the probate process to their benefit (and otherwise prove their claims) will profit. This disparity between otherwise identically situated persons is not what Title III intended or what *Glen* means.

## C.    Reading Title III correctly to bar untimely acquisition by estates furthers congressional intent.

Plaintiffs' assertion that affirming the District Court's correct decision would "upend the balance Congress struck," Opening Br. 27-28, only demonstrates that they fundamentally misconstrue Title III's purpose. By Plaintiffs' telling, Title III is a plaintiff-centric provision that should be broadly interpreted to facilitate claimants' access to the courts. This myopic focus on individual litigants overlooks the Act's broader aims.

The Helms-Burton Act's overarching purpose is to force Cuba towards democracy. Title III is a key piece of leverage within that initiative. That its right

of action can be continuously suspended and then must be terminated once democracy is achieved demonstrates that Title III is a uniquely political and uniquely confined statutory provision. Title III was "intended primarily to create a 'chilling effect'" on the Cuban economy, and thereby pressure the Cuban government politically. H.R. 104-202, at 25. Its private right of action therefore focuses not on compensating victims of the Castro regime, but on using the threat and potential economic impact of lawsuits to drive political change.

That Title III shuts out late-arriving would-be litigants is simply part of its design. Congress created a right of action for a narrow class of potential plaintiffs, with the understanding that even those would-be litigants might never be able to pursue an action if the President thought it more effective to continually suspend the right of action. Indeed, had the Helms-Burton Act achieved its purpose of a democratic transition in Cuba before the last administration let Title III's suspension lapse, Title III's right of action would have terminated without ever becoming available to *any* claimant.

This framework reflects what Title III's private right of action truly is: a political tool for the U.S. government to wield based on its judgment of what will best accomplish a democratic transition in Cuba. That this tool was designed to and has been wielded to preclude some would-be litigants does not mean that its statutory elements should be reshaped to accommodate parties who cannot satisfy them. Title

III's timely acquisition requirement is clear and broad. And it precludes the action here.

## **CONCLUSION**

For these reasons, this Court should affirm.

Dated: August 10, 2023                    Respectfully submitted,

                                          */s/ Kathryn M. Barber*
                                          Kathryn M. Barber
                                          Alex J. Brackett
                                          McGuireWoods LLP
                                          Gateway Plaza
                                          800 East Canal Street
                                          Richmond, VA 23219
                                          T: (804) 775-1227
                                          F: (804) 698-2227
                                          kbarber@mcguirewoods.com
                                          abrackett@mcguirewoods.com

                                          *Counsel for Appellees Trafigura Trading,*
                                          *LLC, Trafigura Group Pte Limited, and*
                                          *Trafigura Pte Limited*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 10, 2023, the foregoing was filed with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, which will serve all counsel of record.

/s/ Kathryn M. Barber
Kathryn M. Barber
McGuireWoods LLP

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 7,799 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman style.

*/s/ Kathryn M. Barber*
Kathryn M. Barber
MCGUIREWOODS LLP
